I am Trey Kitchens. I represent the appellant in this matter, Dr. Melanie Jones, in a grant of summary judgment from the Eastern District of Arkansas, and this appeal follows. As a threshold matter in this case, my argument is colored by the fact that it is not disputed that Dr. Melanie Jones was an exceptional and is an exceptional physician. There is not in the record anything that is critical of her clinical abilities, and in fact, once this process started from August 7th until when she was terminated, she received a stellar review from her medical supervisor on September 8th, Dr. Stevie, and that's at the record at 665. So as we look at this, there's not going to be a clinical criticism of my client. On August 7th, 2020, my client made an initial report that her medical records were being altered. My client sees patients for the ADC, the Arkansas Department of Correction. She works for the appellee. It is a company called WellPath that provides medical care to prisoners. She has worked for WellPath since 2014 when WellPath got the contract with ADC. She had been doing prisoner work prior to WellPath purchasing the contract. When she reported internally and to the ADC the issue about medical records being altered, she was assured that it would be fixed. She was assured that it was simply a glitch, and as the issue went forward and my client continued to report the alteration of medical records for patients that were receiving high-dollar tests and treatment, she was put off again and again by WellPath. WellPath, I anticipate, is going to get up and argue to you that investigations were conducted into my client's allegations. The problem with that is the investigations that were conducted primarily from the computer side were conducted by the ADC, the Arkansas Department of Correction. You can look through both of these appendix line by line, word by word, and you will not find one word from the Arkansas Department of Correction under oath. There is no testimony from ADC. There is no affidavit from ADC. So anything the appellate gets up and argues to, the appellee gets up and argues to you came from the ADC, is absolutely hearsay, and of course it is black-letter law that summary judgment cannot be based on hearsay. My client, after she made her initial report, made further reports to the FBI, to the Arkansas Medical Board, to the Arkansas Pharmacy Board, and to the ADC about what was going on. We believe, based at the summary judgment level, where we receive all inferences, that my client was fired because of the reports of criminal conduct that were being made. This gets to the first crux of this case. The appellee is contending, and the court, in granting summary judgment, contended and ruled that under Oxford v. Sterling drug, that the only way my client would be protected in a wrongful termination whistleblower kind of a case would be if we showed that the criminal activity at issue was criminal activity performed by WellPath. Number one, there is not a single case that can be cited that holds that, that Oxford has been interpreted that the only whistleblower protection you receive is if the employer, and solely the employer, commits the criminal behavior. Those were the underlying facts in Oxford, though, right? Wasn't an employee reporting employer violations of the law? In Sterling, in Oxford v. Sterling drug? Yes, in Oxford. In that case, yes sir, it was, but the court didn't hold the next step that the appellees are taking, that the only way that Oxford drug applies is if it is a reporting of criminal behavior or unlawful behavior, in this case we have criminal behavior, unlawful behavior by the employer. The argument is one that makes a lot of sense. Based on the appellee's argument, if my client reported criminal behavior by a consumer or a client of WellPath, and WellPath fired her for that, she wouldn't be protected. That applies in the face of a progeny of cases, it applies in the face of the Owens case and the Strait case, that by the way were not addressed at all in the appellee's brief, that held that when you report unlawful or criminal behavior, that is a protected activity and your employer can't come in and fire you for it. And that's exactly what the appellees and the court, in ruling how they did, they have expanded the Sterling drug case to something that is not in the case law, and it's not in the Arkansas case law. The Owens and the Strait case are direct lines that say reporting unlawful or criminal activity by somebody else is a protected activity that your employer cannot fire you for. And that's exactly what happened here. The second part of the argument is there is no definite reason given why my client was terminated. The reason that is relevant for this is, was it for reporting the charge being altered? Was it for working too many hours? Was it for working wrong times? Not using the biometric log in? On and on. Those are all facts in dispute. And the court just picked one and went with it, even though there are a myriad of reasons given. A jury should have been allowed to make a determination. Do we believe Dr. Jones? Or do we believe Wellpact? But we were not given that opportunity. Dr. Jones presented a host of information and data about what happened to her emails and what happened to her data about patients. This is something where Dr. Jones certainly had her license on the line, but even more importantly, Dr. Jones' patients' lives were on the line. Reporting this information to both ADC, the medical board, the FBI, was something that she absolutely had to do pursuant to her oath as a doctor. Because when medical records get changed, patients are placed at risk. Obviously... What's your response to the argument, though, that the complaints about not using the biometric system and working the odd hours and so on and so forth, that those complaints predated the report of illegal conduct? Your Honor, that's a great question. On the 27th, on July 27th, there's an email about hours, and there's an email about biometric, and that's part of the record. And in that email, you've got to look and read all of the email, because it talks about what fabulous patient care you've been given, what wonderful care you've been given. And this has to be We were in the middle of a worldwide pandemic, and you know how many doctors worked at three prisons, taking care of thousands of prisoners? One, Dr. Melanie Jones. And she was working 90 to 100 hours a week, caring for the patients. And it beggars belief to think that WellPath would come to the one doctor serving three prisons and say, you know what, you just need to work less. You need to give less patient care. We'll just let those prisoners go by the wayside, and whatever happens to them is fine. Dr. Jones wouldn't do that. Well, you know, it may be illogical that they did that, but the fact is they did. And they did in three different emails and communications before she filed the complaint. And you know, maybe you can make the argument that you shouldn't criticize somebody for working too hard, but the fact is they did. And your honor, with respect to patient care, where we are at the summary judgment stage, they can certainly make that argument that hey, we've complained about this stuff before and ignore the fact that you were going to the FBI, ignore the fact that you were going to the medical board and the ADC, ignore the fact that you were trying to do right by your class, you didn't, so we fired you. And I just don't think at the summary judgment stage where we get all the emphases that is a reasonable conclusion. I'd save my time unless the court has any other questions. Thank you. Thank you, your honors. My name is Mark Stanwell, so I'm here on behalf of the Apple Company, WellPath. I must say in my 24 years of practice in defending employers and employment cases, this is my first time appearing before a federal bench. It's an honor to be here and I hope I don't fumble it too hard. Your honor, I'm going to address the factual issues that Mr. Kitchens brought up kind of on the back side, but we're going to talk a little bit, unless the court would like me to get into it now, but we're going to talk about the scope of the Arkansas whistleblower public policy exception. I mean, it's narrow and it's limited and it was judicially created. There's no support in the Arkansas law that would allow the federal court to expand the limited exception to what the appellant is seeking. When you strictly construe this public policy that was created by the courts, by Sterling and followed by others, the exception requires this court to affirm the district court's holding. As I understand your position, it is that the exception only applies if the whistleblowing is against the employer, if the allegation of illegal conduct is by the employer. That's correct, your honor. But what if there's obvious illegal conduct going on and you just don't know who's doing it? You're required to just remain silent in that situation? Whether an individual is required to remain silent or not is, I think, a separate issue, your honor. I think what the issue would be is would that conduct be protected under the I'm not familiar with the Owens case that was cited by, or that Mr. Kitchens referenced. I'm very familiar with the Strait case. The Strait case, which was, I can't remember the full case site, but it was an employee that had complained about the employer's conduct. And even before the Sterling case, you can go back as far as the Schultz versus Signal Delivery case, which was a Western District case that kind of set out and looked at Arkansas law and said, we believe that the Supreme Court of Arkansas would adopt a public policy exception. And they just kind of went ahead and put it in place. Sterling, the Supreme Court, ultimately held that that would apply. And those cases all involved a nexus between the complainant, the wrongdoing, and the entity engaging in the wrongdoing. Let me ask maybe the same question in a different way. How do we know that the public policy exception is so narrowly limited as you assert? Are you familiar with the Arkansas Supreme Court case in American Greetings Corporation? Does that tend to... Is that the Smith versus American's Greetings Corporation? Yes, it is. I am, Your Honor. Does that support your limitation of the... Yes, yes. Because if I recall the facts of that case, the complainant alleged that his supervisor hit him. That's employment-related conduct. And as a supervisor, I guess you could argue that this conduct that goes along with that, that is the employer acting. So the complainant's complaint against the supervisor would be the employer's conduct, which squarely falls in line with all these other Arkansas cases. Are you basing it on the fact patterns in the cases or on the holding of the court? Or maybe you think there's no difference? Well, the fact pattern of every case since then that I'm aware of, Your Honor, has been an employer. There has been a nexus between the employer, the employee, and the conduct that is alleged to be unlawful, which was committed by the employer. That's the question, though, which is committed by the employer. That's, I mean, where do you... I understand that most of the cases, or maybe all the cases, deal with that factual situation. But I haven't been able to find, even in the Sterling case, where that last clause is specifically stated. It's not specifically stated, Your Honor, but that's what the judicial interpretation has been so far. And I think it would be, I would submit respectfully, would not be within the federal court's decision to decide what public policy or how to expand public policy for the citizens of Arkansas. If the Arkansas legislature felt that it should be expanded beyond the current interpretation, then that's what the Arkansas legislature should do, not the federal judiciary. And imagine this for a second, Your Honor. If you take their belief that it should be stretched beyond the common whistleblower nexus of employer-employee and the employer's conduct, I mean, what kind of, you know, it leads into a parade of horribles. I mean, could, is an employee protected because he or she told her employer that she made a complaint that her neighbor was abusing her pet? If an employer said that they gave a witness statement at a fatality DUI accident at lunchtime, is that employee now protected under the statute? If an employee said that they made a complaint against an auto manufacturer under the Clean Water Protection Act, is that now protected activity? But they're not asking to go that far. They're only asking, as I understand it, it has to be related to the employer. It's employment related. And in her case, she's arguing that clearly I have a duty to report alteration of medical records. But she didn't allege, that's what she believed, and there's no dispute that she raised those issues. That's clearly related to her employer. I mean, we're not talking about complaining about the neighbor's cat. We're talking about something that's clearly related to her employment that only could be done presumably by her employer or maybe the correction. So, I mean, it's kind of an either-or. There were a number of, she admitted that a number of parties that she believed had access to those medical records. There was the medical record provider, software provider. There was the Arkansas Department of Corrections and WellPath. And she admitted on numerous occasions that she didn't know who was doing what. She never identified a wrongdoer. And in the Signal vs. U.S. Filter Recovery Service case, which is an Eastern District case of 2015, what it said in a quote, it says that unless the employer was violating some law, the plaintiff's action fails. She never even identified here or alleged that the employer was engaged in wrongdoing. The Supreme Court, Arkansas Supreme Court in 2001, Palmer vs. Arkansas Council on Economic Education, found essentially the same thing, that the employee didn't allege until summary judgment what actual laws were violated. And then, in the opinion, said even to this day, she hadn't alleged that it was the employer that did it. And that is the same thing that happened here. And that's what the district court picked up on. She never alleged that WellPath was a wrongdoer. And, in fact, the record is clear. WellPath was not the only one with access to these records. And she knew it. As it relates to – but, in any event, you could put that issue aside for the moment, and we still get to the situation where the court granted summary judgment because there was no causal connection. And, Your Honor, you picked up on very squarely what the district court hit in this case, was that the performance issues for which she was ultimately terminated began prior to any protected activity and continued throughout her employment. What was the timeframe between the initial warnings to her and the filing of the complaint? She first brought to WellPath's attention irregularities with the computer system. Now, we would argue that wasn't a complaint, but she brought it to the attention. So, for argument's sake, let's say that is. That was on August 7th. She reported to WellPath in late September that she had gone to the FBI at some point during that time. On July 27th, she was written an email that said, you need to keep normal business hours, you need to clock in, clock out, biometrics. This is not a public hospital. This is a secured state penitentiary. WellPath is a guest in their house. We simply do not enter or exit on our own accord. On August 4th, again, before any concern, she was again reminded you need to work regular business hours. She was told that you coming and going sporadically is creating operational problems for the jail. Again, this is a secured facility in a very chaotic time. Because the prison, not only a secured facility, it's undergoing COVID and COVID protocols. So, we have a whole host of other things that are going on. A doctor simply can't walk in and pull an inmate out of a cell and treat them. You can't simply just alter the security schedules of medical treatment because they have to be shepherded by security officers. So, the doctor is being told these things. She was told again on August 5th, and what she said was, this is not possible. I'm going to work as much as I want. On September 8th, September 9th, and September 25th, she was again told, you need to work the hours that track the health service administrator, which is her supervisor, and the warden, which is 8 to 5. And she says that she is going to work when she feels that she needs to work. And she's not going to work a defined schedule. Mr. Chambers, you'll need to wrap up. I'm sorry. The difference here, and I apologize, Your Honors, the difference here is not only did her conduct for which she was terminated predate her protected activity, she was reminded about that conduct throughout the entire time, and she disregarded her supervisor's orders to comply. That's ultimately why she was terminated. And it's those facts that distinguish the cases cited by the appellant on the causal connection that supports us and that disreports us going forward. Thank you. Thank you. Let's give him two minutes. The biometric argument is a terrible canard. This woman was not crawling in through an open window at the jail. She would get to the jail. If the jailers didn't have her use the biometric system, she went in and treated her patients, to argue otherwise is silly. But is it true that she received specific directions and basically responded that I'm not going to follow these directions? No, sir. What she said was I'm going to do what's necessary to treat my patients. Which essentially is I'm not going to follow your directions. And not arguing the court's point, in the years, in the six years she had worked for WellPath before this, this had never been an issue. Her time and when she worked and how she worked had never been an issue. It's important to note that WellPath gets paid on a per census basis for the number of people there. She was treating very sick people. She didn't get paid more for working more. She was following her oath as a doctor to treat the people that she was tasked with caring for. They come back in and say work 8 to 5. And he mentioned the warden, what the warden wanted. Again, that's hearsay. It is not something that the court could have considered in granting summary judgment. The defense, I'm sorry, the appellees also argue throughout their brief that we didn't articulate the specific criminal statutes at the lower court. And somehow that's weighed. I'm going to touch on that briefly. Every single statute mentioned in the brief is all referenced in the summary judgment. That is something that is simply not true. We are not asking to stretch Oxford. I've been banging my head against this case my entire career, it seems. What we're asking is when you have somebody who is reporting criminal activity, not unlawful activity, not tortious activity, criminal activity under Arkansas statutes, that is a protected activity if it is related to the work, as you observed, Your Honor. We're not talking about the neighbor's cat. And what's your best case subsequent to Sterling or Oxford, we've called it both, where that, is that specifically held? Where is that specifically held? There's not a specific case on point about that. That's why I don't have it and neither does the appellee. So doesn't that mean we would be expanding Arkansas law? No, sir. Because what we're asking for is if you report criminal action related to your work, they can't fire you for it. That's as simple as that. And with that, I'm out of time unless the court has questions. All right. Thank you. Thank you. Mr. Kitchens, Mr. Stamos, we appreciate your arguments. The case is submitted and the court is adjourned.